UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

CHERYL MAYERS,                                  :

                Plaintiff,                     :           10 Civ. 2943 (AJP)

       -against-                             :           **OPINION AND ORDER**

EMIGRANT BANCORP, INC., et al.,                 :

             Defendants.                     :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**ANDREW J. PECK, United States Magistrate Judge:**

           Plaintiff Cheryl Mayers, a forty-seven year old African American woman, brings this action against defendants Emigrant Bank, Year 2000 Amended and Restated Severance Pay and Outplacement Program of Emigrant Savings Bank, Janet Martin, Kimberly Romano and Stephanie Nipe (collectively, "Emigrant" or "defendants") alleging violations of the New York State Human Rights Law ("NYSHRL"), New York City Human Rights Law ("NYCHRL") and the Employee Retirement Income Secutity Act ("ERISA").  (Dkt. No. 1: Compl.)  Mayers asserts that Emigrant "illegally fired" her in retaliation for her complaints of "discrimination, harassment and mistreatment" (Compl. ¶¶ 1, 89-101), and intentionally and wrongfully denied her severance benefits without conducting a "full and fair review" of the circumstances surrounding her termination (Compl. ¶¶ 1, 70-87).

           Presently before the Court is Emigrant's summary judgment motion.  (Dkt. No. 29: Notice of Motion.)  The parties have consented to decision of this case by a Magistrate Judge

pursuant to 28 U.S.C. § 636(c).  (Dkt. No. 16.)  For the reasons set forth below, Emigrant's summary

judgment motion is <u>GRANTED</u> in part and <u>DENIED</u> in part.

## FACTS

Mayers started working for Emigrant on November 17, 1986.  (Dkt. No. 40: Mayers

Dep. at 10-11; Dkt. No. 34: Nipe Aff. Ex. 7: Mayers Aff. ¶ 1; Dkt. No. 35: Defs. Rule 56.1 Stmt.

¶ 1.)  Mayers worked as a bank teller for several years before becoming a "telephone representative"

at Emigrant's Manhattan "call center."  (Mayers Aff. ¶¶ 2-3; <u>see</u> Mayers Dep. at 10-20; Defs. Rule

56.1 Stmt. ¶¶ 1-2.)  Mayers "received a recognition award for Quality Service and Outstanding

Achievement in Sales for the first, second, third and fourth quarter in 1993."  (Mayers Aff. ¶ 4.)

In February 2005, Mayers was promoted to "supervisor" in Emigrant's Ossining call

center.  (Mayers Dep. at 22-24, 28-29; Mayers Aff. ¶¶ 3-4; Defs. Rule 56.1 Stmt. ¶¶ 2-3.)  Mayers

"monitor[ed]" the work of eight to twelve telephone representatives,[1] was responsible for generating

hourly reports, and took customer calls that the telephone representatives "could not handle."

(Mayers Dep. at 25-26, 30-33, 68; Defs. Rule 56.1 Stmt. ¶¶ 5, 7.)  Mayers reported to Richard

Palombo and Vito Messina, the Ossining call center's daytime managers, who in turn reported to call

center director Kim Romano.  (Mayers Dep. at 24-25; Defs. Rule 56.1 Stmt. ¶ 6.)

### Alleged Discriminatory Conduct

The atmosphere at the Ossining call center was "very good" until Palombo began

working there in 2006.  (Dkt. No. 40: Mayers Dep. at 34-35.)  Palombo "was very pushy, he used

---

[1]      In all, there were "[a]bout 50" telephone representatives at the Ossining call center, "four or
five" of whom were males.  (Mayers Dep. at 32, 67; Defs. Rule 56.1 Stmt. ¶ 5.)

to use profanity, at one point he verbally abused some of the reps and -- physically abused a rep."
(Mayers Dep. at 35, 42.)  On one occasion, Palombo "snatched the headset from off a rep and threw
it down on her desk" because she was seated at the wrong station.  (Mayers Dep. at 35-41.)  The
representative, Irma Kelly, was pregnant at the time and subsequently "had to go on disability on
account of what [Palombo] did to her."  (Mayers Dep. at 37-38, 44.)  Mayers told call center director
Kim Romano about this incident but nothing was done.  (Mayers Dep. at 41-44.)  Shortly thereafter,
Irma Kelly was fired because she missed a Saturday shift due to a personal emergency.  (Mayers
Dep. at 44-47.)

On other occasions, Palombo called a female representative a thug (Mayers Dep. at
47-48), sent an "abusive" email to a female representative for being five minutes late (Mayers Dep.
at 48-53), told a pregnant female representative who "was having premature labor" to come to
Ossining from the Manhattan office (Mayers Dep. at 54-56), and told a pregnant female
representative who was on medical leave due to "preeclampsia" that other pregnant employees did
not take medical leave and Palombo did not hire her back when her medical leave ended (Mayers
Dep. at 56-59).  Although Mayers believed that Palombo "single[d] the females out," she did not
report the incidents to anyone at Emigrant.  (Mayers Dep. at 59, 67, 78-79.)  Mayers also testified
that she did not feel that Palombo mistreated her because she was female.  (Mayers Dep. at 64.)

In January 2007, Mayers reprimanded telephone representative Roslyn Johnson[2] for
sitting at the wrong work station.  (Mayers Dep. at 65.)  Johnson put her hand in Mayers' "face and
almost slapped" her, but Mayers "back[ed] off."  (Mayers Dep. at 65-66.)  Mayers reported the

---

[2]      Like Mayers, Johnson is an African American woman.  (Mayers Dep. at 77-78.)

4

incident to Palombo, who made Mayers and Johnson apologize to one another.  (Mayers Dep. at 65-66, 75-76.)  Mayers was unhappy about the way Palombo "handled the situation" and emailed Romano to complain that she "shouldn't have to apologize to" Johnson.  (Mayers Dep. at 65-66, 70-77.)  Mayers did not allege in her email that Palombo "was discriminating against [her] in any way." (Mayers Dep. at 77.)  Romano never responded to Mayers' email.  (Mayers Dep. at 65, 76-77.)

On August 14, 2007, Palombo reprimanded Mayers for, inter alia, emailing a report to "the wrong distribution list, which caused major confusion at high levels."  (Dkt. No. 31: Gigante Aff. Ex. 5: Palombo 8/14/07 Memo; Mayers Dep. at 86-89; Mayers Aff. ¶ 5.)  On August 30, 2007, Mayers made the same "careless mistake[]" which again "caused tremendous confusion."  (Gigante Aff. Ex. 6: Palombo 8/30/07 Memo; Mayers Dep. at 89-90.)  Mayers did not disagree with Palombo's August 30 criticism of her.  (Mayers Dep. at 90.)  But after that, Palombo "picked on" Mayers and "criticiz[ed] anything that [she did] when it came to the reports."  (Mayers Dep. at 59-61, 63-64.)  Mayers felt "singled out" because "[o]ther supervisors ma[d]e mistakes with the report" but if she made "the slightest mistake[, she] would get called in[to] the office."  (Mayers Dep. at 63-64.)

Mayers received a below average performance evaluation in December 2007 stating that she lacked strong "Leadership and Time Management" skills and her work was "rushed and inaccurate."  (Gigante Aff. Ex. 3: 2007 Emp. Eval.; see Mayers Dep. at 62, 82-86; Defs. Rule 56.1 ¶ 8.)  Mayers believed that Palombo gave her a poor review in 2007--and denied her a raise and bonus--because he wanted her to quit.  (Mayers Dep. at 62.)  Mayers' 2008 evaluation showed improvement but she was criticized again for "[o]ccasionally submit[ing] work[] with careless

mistakes." (Gigante Aff. Ex. 4: 2008 Emp. Eval.; see Mayers Dep. at 90-92; Defs. Rule 56.1 Stmt. ¶ 8.)

### Events Leading to Mayers' Termination

On Friday, October 17, 2008, Romano called Mayers and other Ossining employees and told them to report to the Manhattan call center the following Monday, but Mayers "didn't know what it was about." (Dkt. No. 40: Mayers Dep. at 92-95; Dkt. No. 34: Nipe Aff. Ex. 7: Mayers Aff. ¶¶ 6-7; Dkt. No. 35: Defs. Rule 56.1 Stmt. ¶ 14.)

On Monday, October 20, 2008, Mayers reported to the Manhattan call center and began her "daily work as usual." (Mayers Dep. at 95-99.) At approximately 10:30 AM, Mayers and "10 to 11" other Ossining employees were called into Romano's office and told that security was investigating a "serious matter" that must remain "confidential" and not be discussed with anyone. (Mayers Dep. at 99-103; Defs. Rule 56.1 Stmt. ¶¶ 16-17; Dkt. No. 32: Romano Aff. ¶ 4; see Mayers Aff. ¶ 8.) Mayers was told to return to her cubicle until summoned by security. (Mayers Dep. at 102-03; Defs. Rule 56.1 Stmt. ¶ 17.) Later that day, Mayers was escorted to a conference room and interviewed by Emigrant's security chief, Tom Fahey. (Mayers Dep. at 104-05; Mayers Aff. ¶ 9; Defs. Rule 56.1 Stmt. ¶ 17; Dkt. No. 33: Fahey Aff. ¶ 3.)

Fahey asked Mayers to read an anonymous letter addressed to Emigrant's human resources director, Stephanie Nipe. (Mayers Dep. at 105, 111; Mayers Aff. ¶ 9; Defs. Rule 56.1 Stmt. ¶ 18.) The letter contained numerous complaints about Palombo's "unprofessional" behavior and threatened to disclose sensitive customer information, or steal customer funds, unless Palombo was fired. (Romano Aff. Ex. 1: Anonymous Ltr; Mayers Dep. at 105-06, 108; Mayers Aff. ¶ 9;

H:\OPIN\MAYERS-Cheryl

Defs. Rule 56.1 Stmt. ¶¶ 9-13.)   In particular, the letter complained that Palombo had:

(1) threatened to fire a pregnant employee "because she took days off for doctor appointments"

(2) "ripp[ed] a headset off" a female employee because she was seated at the wrong station;

(3) "antagonized" Mayers and "unfair[ly]" denied her a bonus in 2006 and 2007; (4) "belittled" a

female employee "to the point w[h]ere it affected her heart ailment"; (5) "spoke[] down" to a male

employee "as if he were a child"; (6) "unfairly" fired three employees, including one male, for "Time

Stealing" even though it was common for call center representatives to "clock in" co-workers who

were not actually working; (7) fired "an innocent girl" because another employee used her User ID

and password to access a customer account; (8) called a female employee a "disgusting hateful

person," thereby "reduc[ing] her to tears"; and (9) provoked a female employee into submitting a

resignation letter and did not let her retract it when she changed her mind.  (Anonymous Ltr. at 1-6.)

The letter called Palombo a "sociopath" with "no conscience," a "lazy thinker" with "pathetic

managing skills," who was not a knowledgeable supervisor and was "oblivious to the problems that

are arising in the call center that he is supposed to be managing."  (Id.)

Fahey asked Mayers whether "the information in the letter [was] true," and Mayers

said that she believed "the information regarding [Palombo] was right."  (Mayers Dep. at 80-81,

107-09, 111-32, 136-37; Mayers Aff. ¶ 12; Defs. Rule 56.1 Stmt. ¶¶ 18, 19; Fahey Aff. ¶ 4.)  Mayers

did not, however, agree with the threat to release customer information because she thought that was

"wrong."  (Mayers Dep. at 134-37.)  Mayers did not elaborate on any of the incidents mentioned in

the letter and said that she had "no clue" who wrote it.  (Mayers Dep. at 107-10, 137-38; Mayers Aff.

¶ 12; Defs. Rule 56.1 Stmt. ¶¶ 19-20.)

Later that day, Ossining call center representative Nicole Kelly approached Mayers and asked "what took place" during her interview with Fahey.  (Mayers Dep. at 145, 201; Mayers Aff. ¶ 13.)  Mayers told Kelly that "we are not supposed to discuss" the investigation, and "[w]hen you go downstairs you will find out for yourself."  (Mayers Dep. at 145-46, 201; Mayers Aff. ¶ 13.)  Daphne Jean, another Ossining call center representative, also approached Mayers  and asked her what she "thought of the letter."  (Mayers Dep. at 196-98; Defs. Rule 56.1 Stmt. ¶ 28.)  Mayers told Jean that they were not "supposed to discuss" the letter but did not report the conversation to Romano or Fahey.[3/]  (Mayers Dep. at 197-98; Defs. Rule 56.1 Stmt. ¶ 29.)

On October 21, 2008, Romano reminded Mayers "not to discuss the [confidential] investigation" with anyone and "to notify [her or] Mr. Fahey . . . if [she] observed any other employees discussing the investigation."  (Mayers Dep. at 149-52; Mayers Aff. ¶ 14; Romano Aff. ¶ 6; Defs. Rule 56.1 Stmt. ¶¶ 24-25.)

On October 22, 2008, Kelly told Mayers that former Ossining employees "Keturah Smith and Irma Kelly keep calling her."  (Mayers Dep. at 149, 153-56; Mayers Aff. ¶ 15; Defs. Rule 56.1 Stmt. ¶¶ 26-27.)  Mayers immediately told Romano about the calls[4/] and Romano yelled at Kelly "for being friends with Irma and Keturah."  (Mayers Dep. at 153-61, 163, 193-94; Mayers Aff.

---

[3/]      Jean also told Mayers that she had spoken to an ex-employee named Tina.  (Mayers Dep. at 216-22.)  Mayers told Jean to tell Romano about the call but did not report it herself because it "had nothing to do with what was going on"; Tina just called Jean to "say hi."  (Mayers Dep. at 216-22; see Defs. Rule 56.1 Stmt. ¶ 29.)

[4/]      According to Romano, she personally "observed" Mayers and Kelly "discussing the investigation."  (Romano Aff. ¶ 7.)  Romano notified Emigrant management (Janet Martin) that Mayers and Kelly "failed to comply with the mandate prohibiting their discussion of the investigation."  (Romano Aff. ¶ 7; Defs. Rule 56.1 Stmt. ¶ 30.)

¶¶ 16-18.)  Later that morning, Mayers was "summoned" to personnel where she met with Romano, Nipe and Emigrant consultant Janet Martin.  (Mayers Dep. at 158, 164-68; Mayers Aff. ¶ 19; Defs. Rule 56.1 Stmt. ¶ 30; Romano Aff. ¶ 8.)  Martin told Mayers that she was being fired, effective immediately, because she "failed to live up to her managerial responsibilities" and because she "withheld evidence."  (Mayers Dep. at 168-70, 173-74, 210-11; Mayers Aff. ¶ 19; Defs. Rule 56.1 Stmt. ¶ 31; Romano Aff. ¶ 8.)  As Mayers got up to leave, Martin added:  "and by the way[,] you will not be receiving a severance."  (Mayers Dep. at 169, 174-75; Mayers Aff. ¶ 20.)  Mayers was escorted out of the building by security.  (Mayers Dep. at 170-72; Mayers Aff. ¶ 20.)

Mayers later discovered that Kelly and Ossining call center supervisor Asha Rattan also were fired and that they also had told Fahey that they agreed with the anonymous letter. (Mayers Dep. at 166-67, 171-73, 195-96; cf. Defs. Rule 56.1 Stmt. ¶ 32.)[5/]  Mayers concluded that she was fired because she "spoke up" and "told the truth" about Palombo.  (Mayers Dep. at 80-81, 166-67, 194-95, 234; Defs. Rule 56.1 Stmt. ¶ 33.)  Mayers also speculated that her firing might be connected to her age, sex or race (Mayers Dep. at 80-82), but admitted that she never "complain[ed] to anyone while [she] was employed at Emigrant about discrimination, retaliation and/or unfair treatment." (Mayers Dep. at 109, 234; Defs. Rule 56.1 Stmt. ¶ 22.)  Moreover, although Mayers did not think that by "agreeing with th[e] letter [she was] making a complaint about age, race, sex, gender or any other related discrimination against" her, she nonetheless believed the letter

---

[5/]    Ossining call center representative Marla Darby also "agreed with the contents of the letter concerning Mr. Palombo. . . . [but] was not terminated following her participation in the investigation."  (Defs. Rule 56.1 Stmt. ¶ 23; Romano Aff. ¶ 10; Fahey Aff. ¶ 4.)

constituted a complaint of gender discrimination "[b]ecause the majority of the names that were

mentioned" were female.  (Mayers Dep. at 109-10; Defs. Rule 56.1 Stmt. ¶ 21.)

**Mayers' Claim for Severance Benefits Under Emigrant's Severance Plan**

On November 5, 2008, Mayers submitted a claim for severance benefits seeking

$29,914.82 (26 weeks pay) under Emigrant's "Severance Pay and Outplacement Program."[6/]  (Dkt.

No. 35: Defs. Rule 56.1 Stmt. ¶ 34; Nipe Aff. Ex. 3: Saynor 11/5/08 Ltr.; see Dkt. No. 40: Mayers

Dep. at 188-90, 202-03.)  Emigrant Director of Human Resources Stephanie Nipe, a member of

Emigrant's "Committee of Fiduciaries,"[7/] investigated Mayers claim. (Defs. Rule 56.1 Stmt. ¶ 37;

Nipe Aff. ¶¶ 1, 5.)   In particular, Nipe reviewed "a December 1, 2008 memorandum from

Ms. Romano . . . outlining the events that precipitated [Mayers'] termination."  (Defs. Rule 56.1

Stmt. ¶ 37; Nipe Aff. ¶ 5.)  Romano's memorandum stated that "[i]t was brought to [Romano's]

attention that [Mayers] and two others did not follow the instructions that they were given," namely,

that Mayers

> discussed confidential details about the investigation with her subordinates (Nicole
> Kelly-Satchell & Daphne Jean). . . . [and] failed to make Kim [Romano] or Tom
> [Fahey] aware that employees under her supervision were discussing confidential

---

[6/]    According to the Plan, "Employee[s] with 20 or more years of Service" who are not
terminated "for Cause" are entitled to 26 weeks of severance pay.  (Dkt. No. 34: Nipe Aff.
Ex. 1: Year 2000 Severance Pay & Outplacement Program § 2(a)(i)(A).)  An employee is
terminated "for Cause" where: (1) she "continual[ly] neglect[s] . . . to perform [her] duties"
after notice or (2) engages in "dishonesty or willful misconduct."  (Year 2000 Severance Pay
& Outplacement Program § 1(d).)

[7/]    Emigrant's "Committee of Fiduciaries" is the "Program Administrator" and is responsible
for "review[ing] and dispos[ing]" of all claims, and deciding "any question arising in
connection with the Program," including whether or not an employee was terminated "for
Cause." (Year 2000 Severance Pay & Outplacement Program §§ 1(n), 9(e)-(f); see Nipe Aff.
Ex. 2: Summary Plan Description at 13.)

information i.e. Nicole Kelly-Satchell disclosed confidential information via telephone and text messaging to ex-employees.

(Nipe Aff. Ex. 6: Romano 12/1/08 Memo.)  Based on the investigation, Nipe and the "Committee of Fiduciaries" determined that Emigrant "had a good faith basis for terminating Ms. Mayers for cause due to her failure to comply with an express mandate from Kimberly Romano not to discuss or disclose any matters involving Emigrant's investigation of the anonymous letter."  (Nipe Aff. ¶¶ 5-7; Defs. Rule 56.1 Stmt. ¶¶ 37-38.)

On December 5, 2008, Emigrant issued a letter denying Mayers' application for severance benefits.  (Defs. Rule 56.1 Stmt. ¶ 38; Nipe Aff. ¶ 6 & Ex. 4: Nipe 12/5/08 Ltr.; see Mayers Dep. at 203-04.)  The letter explained that Mayers was not eligible for severance benefits because her "actions rose to the level of 'willful misconduct' and therefore she was terminated for Cause within the meaning of the Program."  (Nipe 12/5/08 Ltr. at 1; Defs. Rule 56.1 Stmt. ¶ 38; Nipe Aff. ¶ 7; see Mayers Dep. at 204-05.)

On January 23, 2009, Mayers requested copies of the documents relied upon by Emigrant in denying her severance benefits.  (Defs. Rule 56.1 Stmt. ¶ 40; Nipe Aff. ¶ 8 & Ex. 5: Dagg 1/23/09 Ltr.; see Mayers Dep. at 206-07.)  On January 27, 2009, Nipe provided Mayers with: (1) a copy of Romano's December 1, 2008 memorandum; and (2) emails between Nipe and members of Emigrant's Committee of Fiduciaries approving the denial of severance benefits.  (Defs. Rule 56.1 Stmt. ¶ 40; Nipe Aff. ¶ 8 & Ex. 6: Nipe 1/27/08 Ltr. & Encs.; see Mayers Dep. at 206-08.)

On February 2, 2009, Mayers appealed the denial of her severance benefits claim and submitted an affidavit explaining her view of the events leading to her termination.  (Defs. Rule 56.1 Stmt. ¶ 41; Nipe Aff. ¶ 9 & Ex. 7: Dag 2/2/09 Ltr. & Mayers Aff.; see Mayers Dep. at 208-12.)

11

Nipe denied Mayers' appeal on May 19, 2009. (Defs.' Rule 56.1 Stmt. ¶ 42; Nipe Aff. ¶ 10 & Ex. 8: Nipe 5/19/09 Ltr.; Mayers Dep. at 212-16.)

## ANALYSIS

## I.     SUMMARY JUDGMENT STANDARD

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary "judgment should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); see also, e.g., Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S. Ct. 2548, 2552 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247, 106 S. Ct. 2505, 2509-10 (1986); Lang v. Ret. Living Pub. Co., 949 F.2d 576, 580 (2d Cir. 1991).

The burden of showing that no genuine factual dispute exists rests on the party seeking summary judgment. See, e.g., Adickes v. S.H. Kress & Co., 398 U.S. 144, 157, 90 S. Ct. 1598, 1608 (1970); Chambers v. TRM Copy Ctrs. Corp., 43 F.3d 29, 36 (2d Cir. 1994); Gallo v. Prudential Residential Servs., Ltd. P'ship, 22 F.3d 1219, 1223 (2d Cir. 1994). The movant may discharge this burden by demonstrating to the Court that there is an absence of evidence to support the non-moving party's case on an issue on which the non-movant has the burden of proof. See, e.g., Celotex Corp. v. Catrett, 477 U.S. at 323, 106 S. Ct. at 2552-53.

To defeat a summary judgment motion, the non-moving party must do "more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586, 106 S. Ct. 1348, 1356 (1986). Instead, the non-moving party must "set out specific facts showing a genuine issue for trial." Fed. R. Civ. P.

56(e); accord, e.g., Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. at 587, 106 S. Ct. at 1356; Weinstock v. Columbia Univ., 224 F.3d 33, 41 (2d Cir. 2000) (At summary judgment, "[t]he time has come . . . 'to put up or shut up.'" (citations omitted)), cert. denied, 540 U.S. 811, 124 S. Ct. 53 (2003).

In evaluating the record to determine whether there is a genuine issue as to any material fact, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." Anderson v. Liberty Lobby, Inc., 477 U.S. at 255, 106 S. Ct. at 2513.[8/] The Court draws all inferences in favor of the nonmoving party only after determining that such inferences are reasonable, considering all the evidence presented. See, e.g., Apex Oil Co. v. DiMauro, 822 F.2d 246, 252 (2d Cir.), cert. denied, 484 U.S. 977, 108 S. Ct. 489 (1987). "If, as to the issue on which summary judgment is sought, there is any evidence in the record from any source from which a reasonable inference could be drawn in favor of the nonmoving party, summary judgment is improper." Chambers v. TRM Copy Ctrs. Corp., 43 F.3d at 37.

In considering a motion for summary judgment, the Court is not to resolve contested issues of fact, but rather is to determine whether there exists any disputed issue of material fact. See, e.g., Donahue v. Windsor Locks Bd. of Fire Comm'rs, 834 F.2d 54, 58 (2d Cir. 1987); Knight v. U.S. Fire Ins. Co., 804 F.2d 9, 11 (2d Cir. 1986), cert. denied, 480 U.S. 932, 107 S. Ct. 1570 (1987). To evaluate a fact's materiality, the substantive law determines which facts are critical and which facts are irrelevant. See, e.g., Anderson v. Liberty Lobby, Inc., 477 U.S. at 248, 106 S. Ct. at 2510.

---

[8/]    See also, e.g., Feingold v. N.Y., 366 F.3d 138, 148 (2d Cir. 2004); Chambers v. TRM Copy Ctrs. Corp., 43 F.3d at 36; Gallo v. Prudential Residential Servs., Ltd. P'ship, 22 F.3d at 1223.

While "disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment[,] [f]actual disputes that are irrelevant or unnecessary will not be counted." Id. at 248, 106 S. Ct. at 2510 (citations omitted); see also, e.g., Knight v. U.S. Fire Ins. Co., 804 F.2d at 11-12.

### A.    Additional Summary Judgment Standards in Employment Discrimination Cases

When a case turns on the intent of one party, as employment discrimination claims often do, a "trial court must be cautious about granting summary judgment." Gallo v. Prudential Residential Servs., Ltd. P'Ship, 22 F.3d 1219, 1224 (2d Cir. 1994).[9/]  Because the employer rarely leaves direct evidence of its discriminatory intent, the Court must carefully comb the available evidence in search of circumstantial proof to undercut the employer's explanations for its actions. E.g., Gallo v. Prudential Residential Srvs., Ltd. P'Ship, 22 F.3d at 1224. "[S]ummary judgment may not be granted simply because the court believes that the plaintiff will be unable to meet his or her burden of persuasion at trial. There must either be a lack of evidence in support of the plaintiff's position or the evidence must be so overwhelmingly tilted in one direction that any contrary finding would constitute clear error." Danzer v. Norden Sys., Inc., 151 F.3d 50, 54 (2d Cir. 1998) (citations omitted).  Nonetheless, when an employer provides convincing evidence to explain its conduct and

---

[9/]    Accord, e.g., Feingold v. N.Y., 366 F.3d 138, 149 (2d Cir. 2004); Kerzer v. Kingly Mfg., 156 F.3d 396, 400 (2d Cir. 1998) ("[I]n an employment discrimination case when, as here, the employer's intent is at issue, the trial court must be especially cautious about granting summary judgment."); McLee v. Chrysler Corp., 109 F.3d 130, 135 (2d Cir. 1997) ("[C]aution must be exercised in granting summary judgment where motive is genuinely in issue."); Cardoza v. Healthfirst, Inc., 210 F. Supp. 2d 224, 227 (S.D.N.Y. 1999); see also, e.g., Chambers v. TRM Copy Ctrs. Corp., 43 F.3d 29, 40 (2d Cir. 1994).

the plaintiff's argument consists of purely conclusory allegations of discrimination, the Court may conclude that no material issue of fact exists and it may grant summary judgment to the employer. E.g., Budde v. H&K Distrib. Co., No. 99-9449, 216 F.3d 1071 (table), 2000 WL 900204 at *1 (2d Cir. June 29, 2000); Stern v. Trs. of Columbia Univ., 131 F.3d 305, 312 (2d Cir. 1997); Meloff v. N.Y. Life Ins. Co., 51 F.3d 372, 375 (2d Cir. 1995).

In other words, to defeat summary judgment, "the plaintiff's admissible evidence must show circumstances that would be sufficient to permit a rational finder of fact to infer that the defendant's employment decision was more likely than not based in whole or in part on discrimination." Stern v. Trs. of Columbia Univ., 131 F.3d at 312; see, e.g., Schnabel v. Abramson, 232 F.3d 83, 90-91 (2d Cir. 2000); Weinstock v. Columbia Univ., 224 F.3d 33, 42 (2d Cir. 2000) (The question on summary judgment is "whether the evidence, taken as a whole, supports a sufficient rational inference of discrimination.  To get to the jury, it is not enough . . . to disbelieve the employer; the factfinder must also believe the plaintiff's explanation of intentional discrimination." (quotations & alterations omitted)), cert. denied, 540 U.S. 811, 124 S. Ct. 53 (2003); Van Zant v. KLM Royal Dutch Airlines, 80 F.3d 708, 714 (2d Cir. 1996) (plaintiff must "produce not simply 'some' evidence, but 'sufficient evidence to support a rational finding that the legitimate, nondiscriminatory reasons proffered by the employer were false, and that more likely than not [discrimination] was the real reason for the discharge'").[10/]  Indeed, the Second Circuit "went out of [its] way to remind district courts that the 'impression that summary judgment is

---

[10/]    See also, e.g., Budde v. H&K Distrib. Co., 2000 WL 900204 at *1; Scaria v. Rubin, 94 Civ. 3333, 1996 WL 389250 at *5 (S.D.N.Y. July 11, 1996) (Peck, M.J.), aff'd, 117 F.3d 652, 654 (2d Cir. 1997).

unavailable to defendants in discrimination cases is unsupportable.'" <u>Weinstock</u> v. <u>Columbia Univ.</u>, 224 F.3d at 41.

## II.   EMIGRANT IS ENTITLED TO SUMMARY JUDGMENT ON MAYERS' NYSHRL AND NYCHRL RETALIATION CLAIMS

### A.   <u>Legal Standards Governing Employment Retaliation Claims</u>

"Under both the State and City Human Rights Laws, it is unlawful to retaliate against an employee for opposing discriminatory practices." <u>Forrest</u> v. <u>Jewish Guild for the Blind</u>, 3 N.Y.3d 295, 312-13, 786 N.Y.S.2d 382, 396 (2004); <u>see</u> N.Y. Exec. Law § 296(7); N.Y. City Admin. Code §§ 8-107(7).[11/]

Retaliation claims brought pursuant to the NYSHRL and the NYCHRL are analyzed using the three-step, burden-shifting framework established by the Supreme Court in <u>McDonnell Douglas Corp.</u> v. <u>Green</u>, 411 U.S. 792, 93 S. Ct. 1817 (1973).  <u>See</u>, <u>e.g.</u>, <u>Borski</u> v. <u>Staten Island Rapid Transit</u>, No. 09-4916-cv, 2011 WL 891740 at *1 (2d Cir. Mar. 16, 2011) ("We analyze both federal and state law retaliation claims under the familiar burden-shifting approach of <u>McDonnell Douglas Corp.</u> v. <u>Green.</u>"); <u>Vito</u> v. <u>Bausch & Lomb Inc.</u>, 403 F. App'x 593, 597 (2d Cir. 2010) ("'Claims for retaliation [under NYSHRL] are analyzed under the same burden-shifting framework established for Title VII cases.'"); <u>Stavis</u> v. <u>GFK Holding, Inc.</u>, --- F. Supp. 2d ---, 09 Civ. 5096, 2011 WL 335664 at *7 (S.D.N.Y. Jan. 28, 2011) ("Retaliation claims arising under the NYSHRL

---

[11/]     <u>Accord</u>, <u>e.g.</u>, <u>Bennett</u> v. <u>Verizon Wireless</u>, 326 F. App'x 9, 10 (2d Cir.), <u>cert. denied</u>, 130 S. Ct. 494 (2009); <u>Bonnano</u> v. <u>Verizon N.Y., Inc.</u>, 06 Civ. 6671, 2011 WL 832855 at *6 (S.D.N.Y. Mar. 4, 2011); <u>Butler</u> v. <u>N.Y. Health & Racquet Club</u>, --- F. Supp. 2d ---, 08 Civ. 591, 2011 WL 310333 at *9 (S.D.N.Y. Jan. 26, 2011); <u>Cretella</u> v. <u>Liriano</u>, 633 F. Supp. 2d 54, 70 (S.D.N.Y. 2009), <u>aff'd</u>, 370 F. App'x 157 (2d Cir. 2010).

and the NYCHRL are also analyzed using the McDonnell Douglas framework."); Hall v. Parker Hannifan Corp., --- F. Supp. 2d. ---, No. 08-CV-6033, 2009 WL 4406145 at *2 (W.D.N.Y. Nov. 30, 2009) (Retaliation claims under the NYSHRL are generally analyzed using the Title VII McDonnell Douglas burden-shifting framework.); Kemp v. Metro-North R.R., 04 Civ. 9926, 2007 WL 1741256 at *16 (S.D.N.Y. June 14, 2007) ("When evaluating claims of retaliation under the . . . NYSHRL, and NYCHRL, courts use the well-known McDonnell Douglas burden-shifting framework."), aff'd, 316 F. App'x 25 (2d Cir. 2009).[12/]

The initial step of this familiar framework requires the plaintiff to establish a prima facie case of retaliation.  E.g., Borski v. Staten Island Rapid Transit, 2011 WL 891740 at *1 (McDonnell Douglas "places the initial burden on the plaintiff to demonstrate a prima facie case of retaliation."); see, e.g., Kaytor v. Elec. Boat Corp., 609 F.3d 537, 552-53 (2d Cir. 2010); Hicks v. Baines, 593 F.3d 159, 164 (2d Cir. 2010); Jute v. Hamilton Sundstrand Corp., 420 F.3d 166, 173 (2d Cir. 2005).[13/] "To establish a prima facie case of unlawful retaliation under the NYSHRL, 'a plaintiff must prove that:  (1) he participated in a legally protected activity; (2) his employer knew of the protected activity; (3) an adverse employment action ensued; and (4) a causal connection existed

---

[12/] See also, e.g., Fleming v. MaxMara USA, Inc., 371 F. App'x 115, 116 (2d Cir. 2010) (NYCHRL retaliation claim); Ibok v. Sec. Indus. Automation Corp., 369 F. App'x 210, 213 (2d Cir. 2010) (NYCHRL retaliation claim); Matya v. United Ref. Co. 323 F. App'x 65, 67, (2d Cir. 2009) (NYSHRL retaliation claim); Bennett v. Verizon Wireless, 326 F. App'x at 10 (NYSHRL retaliation claim).

[13/] See also, e.g., Ibok v. Sec. Indus. Automation Corp. 369 F. App'x at 213; Maietta v. Potter, 70 F. App'x 28, 30 (2d Cir. 2003); Pellegrini v. Sovereign Hotels, Inc., 740 F. Supp. 2d 344, 354 (N.D.N.Y. 2010); McKenzie v. Gibson, 07 Civ. 6714, 2010 WL 3528922 at *7 (S.D.N.Y. Aug. 24, 2010); Lundy v. Town of Brighton, 732 F. Supp. 2d 263, 271 (W.D.N.Y. 2010); Fleming v. MaxMara USA, Inc., 644 F. Supp. 2d 247, 269 (E.D.N.Y. 2009), aff'd, 371 F. App'x 115 (2d Cir. 2010); Hall v. Parker Hannifan Corp., 2009 WL 4406145 at *2.

between the protected activity and the adverse employment action.'"  <u>Stavis</u> v. <u>GFK Holding Inc.</u>, 2011 WL 335664 at *7 (quoting <u>Bowles</u> v. <u>N.Y.C. Transit Auth.</u>, 285 F. App'x 812, 814 (2d Cir. 2008)); <u>accord</u>, <u>e.g.</u>, <u>Forrest</u> v. <u>Jewish Guild for the Blind</u>, 3 N.Y.3d at 313, 786 N.Y.S.2d at 396; <u>Bonnano</u> v. <u>Verizon N.Y., Inc.</u>, 2011 WL 832855 at *11; <u>Hall</u> v. <u>Parker Hannifan Corp.</u>, 2009 WL 4406145 at *2; <u>Kemp</u> v. <u>Metro-North R.R.</u>, 2007 WL 1741256 at *16.  "The elements of retaliation under the NYCHRL differ only in that the plaintiff need not prove any adverse employment action; instead, he must prove that something happened that would be reasonably likely to deter a person from engaging in protected activity."  <u>Gutierrez</u> v. <u>City of N.Y.</u>, --- F. Supp. 2d ---, 08 Civ. 6537, 2010 WL 4823644 at *11 n.12 (S.D.N.Y. Nov. 29, 2010) (quotations omitted); <u>accord</u>, <u>e.g.</u>, <u>Stavis</u> v. <u>GFK Holding Inc.</u>, 2011 WL 335664 at *7 ; <u>Deshpande</u> v. <u>Medisys Health Network, Inc.</u>, No. 07-CV-375, 2010 WL 1539745 at *22 n.22 (E.D.N.Y. Apr. 16, 2010).

Establishment of a prima facie case gives rise to a rebuttable presumption of unlawful retaliation.  <u>See</u>, <u>e.g.</u>, <u>El Sayed</u> v. <u>Hilton Hotels Corp.</u>, 627 F.3d 931, 932 (2d Cir. 2010) ("[T]he prima facie case establishes only a rebuttable presumption of retaliation."); <u>Hicks</u> v. <u>Baines</u>, 593 F.3d at 164 ("If the plaintiff sustains this initial burden, 'a presumption of retaliation arises.'"); <u>Jute</u> v. <u>Hamilton Sundstrand Corp.</u>, 420 F.3d at 173 (same).<u>14/</u>  The burden then shifts to the defendant to articulate a legitimate, non-retaliatory rationale for its employment decision.  <u>See</u>, <u>e.g.</u>, <u>Kaytor</u> v. <u>Elec. Boat Corp.</u>, 609 F.3d at 552-53 ("At the summary judgment stage, if the plaintiff presents at least a minimal amount of evidence to support the elements of the claim, the burden of production

---

<u>14/</u>      Accord, <u>e.g.</u>, <u>Deshpande</u> v. <u>Medisys Health Network, Inc.</u>, 2010 WL 1539745 at *9; <u>Hall</u> v. <u>Parker Hannifan Corp.</u>, 2009 WL 4406145 at *2.

shifts to the defendant to proffer a legitimate non-retaliatory reason for the adverse employment action."); Hicks v. Baines, 593 F.3d at 164 ("The defendant must then 'articulate a legitimate, non-retaliatory reason for the adverse employment action.'"); Jute v. Hamilton Sundstrand Corp., 420 F.3d at 173 ("[U]nder the second step of the burden-shifting analysis, the onus falls on the employer to articulate a legitimate, non-retaliatory reason for the adverse employment action."); Raniola v. Bratton, 243 F.3d 610, 625 (2d Cir. 2001) (Sotomayor, C.J.) ("Once a prima facie case of retaliation is established, the burden of production shifts to the employer to demonstrate that a legitimate, nondiscriminatory reason existed for its action.").[15]

If the defendant articulates a non-retaliatory rationale for its employment decision, the burden shifts back to the plaintiff to show that the defendant's proffered explanation is a pretext for unlawful retaliation.  See, e.g., Kaytor v. Elec. Boat Corp., 609 F.3d at 553 (If the employer produces a "legitimate non-retaliatory reason for the adverse employment action. . . . the employee must, in order to avoid summary judgment, point to evidence sufficient to permit an inference that the employer's proffered non-retaliatory reason is pretextual and that retaliation was a 'substantial reason for the adverse employment action.'"); Hicks v. Baines, 593 F.3d at 164 (If the employer offers a non-retaliatory explanation for its conduct, "'the presumption of retaliation dissipates and the employee must show that retaliation was a substantial reason for the adverse employment

---

[15]    Accord, e.g., Bowles v. N.Y.C. Transit Auth., 285 F. App'x at 814; Pellegrini v. Sovereign Hotels, Inc., 740 F. Supp. 2d at 354; McKenzie v. Gibson, 2010 WL 3528922 at *8;  Lundy v. Town of Brighton, 732 F. Supp. 2d at 271; Deshpande v. Medisys Health Network, Inc., 2010 WL 1539745 at *9; Hall v. Parker Hannifan Corp., 2009 WL 4406145 at *2.

action.'"); Jute v. Hamilton Sundstrand Corp. 420 F.3d at 173 (same); Raniola v. Bratton, 43 F.3d at 625 (same).[16]

At this stage of the inquiry, merely disproving the defendant's legitimate explanation is insufficient; the plaintiff must produce competent evidence that "the employer's decision was motivated, at least in part, by an intent to retaliate against him." El Sayed v. Hilton Hotels Corp., 627 F.3d at 933; see, e.g., Ibok v. Sec. Indus. Automation, 369 F. App'x at 213; Hicks v. Baines, 593 F.3d at 164 (A plaintiff sufficiently demonstrates pretext if he shows that "'a retaliatory motive played a part in the adverse employment actions even if it was not the sole cause.'"); Raniola v. Bratton, 243 F.3d at 625 ("A retaliatory motive must be . . . at least a substantial or motivating factor behind the adverse action." (quotations omitted)).[17]

"A plaintiff may prove that retaliation was a 'substantial' or 'motivating' factor behind an adverse employment action either '(1) indirectly, by showing that the protected activity was followed closely by discriminatory treatment, or through other circumstantial evidence such as disparate treatment of fellow employees who engaged in similar conduct; or (2) directly, through

---

[16]    Accord, e.g., El Sayed v. Hilton Hotels Corp., 627 F.3d at 932-33; Ibok v. Sec. Indus. Automation Corp., 369 F. App'x at 213; Bennet v. Verizon Wireless, 326 F. App'x at 10; Matya v. United Ref. Co., 323 F. App'x at 67; Bowles v. N.Y.C. Transit Auth., 285 F. App'x at 814; Pellegrini v. Sovereign Hotels, Inc., 740 F. Supp. 2d at 354; McKenzie v. Gibson, 2010 WL 3528922 at *8; Deshpande v. Medisys Health Network, Inc., 2010 WL 1539745 at *9; Hall v. Parker Hannifan Corp., 2009 WL 4406145 at *2.

[17]    Accord, e.g., Pellegrini v. Sovereign Hotels, Inc., 740 F. Supp. 2d at 354; Lundy v. Town of Brighton, 732 F. Supp. 2d at 271; Deshpande v. Medisys Health Network, Inc., 2010 WL 1539745 at *9.

evidence of retaliatory animus directed against the plaintiff by defendant.'" Raniola v. Bratton, 243

F.3d at 625.[18]

**B.    Mayers Has Not Established A Prima Facie Case of Retaliation Because A Reasonable Employer Would Not Have Know that She Engaged in a Protected Activity**

An employee engages in a protected activity when she complains of an employment

practice that she reasonably believes violates the law.  E.g., Cruz v. Coach Stores, Inc., 202 F.3d

560, 566 (2d Cir. 2000) ("The term 'protected activity' refers to action taken to protest or oppose

statutorily prohibited discrimination.").[19]  In order for a complaint to form the basis of a retaliation

---

[18]    See, e.g., Gorzynski v. Jetblue Airways Corp., 596 F.3d 93, 110 (2d Cir. 2010) ("'[A] plaintiff can indirectly establish a causal connection to support a discrimination or retaliation claim by showing that the protected activity was closely followed in time by the adverse employment action.'"); Butts v. NYC Dep't of Hous. Pres. & Dev., 307 F. App'x 596, 599 (2d Cir. 2009) ("The plaintiff can establish the causal connection indirectly by showing that the protected activity was closely followed by discrimination, or directly by showing evidence of a discriminatory animus."); Pellegrini v. Sovereign Hotels, Inc., 740 F. Supp. 2d at 354 ("'[P]roof of causal connection can be established indirectly by showing that the protected activity was followed closely by discriminatory treatment or through other evidence such as disparate treatment of fellow employees who engaged in similar conduct, or directly through evidence of retaliatory animus directed against a plaintiff by the defendant.'").

[19]    See also, e.g., Kessler v. Westchester Cnty. Dep't of Soc. Servs., 461 F.3d 199, 210 (2d Cir. 2006) (The "'protected activity'" element requires that the plaintiff "'have a good faith, reasonable belief that he was opposing an employment practice made unlawful'" by the statutes.); Treglia v. Town of Manlius, 313 F.3d 713, 719 (2d Cir. 2002) ("A plaintiff may prevail on a claim for retaliation even when the underlying conduct complained of was not in fact unlawful 'so long as he can establish that he possessed a good faith, reasonable belief that the underlying challenged actions of the employer violated [the] law.'"); McMenemy v. City of Rochester, 241 F.3d 279, 283, 285 (2d Cir. 2001) ("'[P]laintiff must have had a 'good faith, reasonable belief that the underlying challenged actions of the employer violated law.'"); Galdieri-Amrosini v. Nat'l Realty & Dev. Corp., 136 F.3d 276, 292 (2d Cir. 1998) ("'[P]articipation in protected activity" requires a "'good faith, reasonable belief that the underlying employment practice was unlawful.'").

claim, however, the employer must have "understood, or could reasonably have understood, that the plaintiff's opposition was directed at conduct prohibited by" the employment discrimination laws. Galdieri-Ambrosini v. Nat'l Realty & Dev. Corp., 136 F.3d at 292; see, e.g., Lee v. Sony BMG Music Entm't, Inc., 07 Civ. 6733, 2010 WL 743948 at *11 (S.D.N.Y. Mar. 3, 2010) ("A complaint cannot be the basis for a . . . retaliation claim if plaintiff's complaints to management could not be understood to have been about race" or other protected classifications.); Brummell v. Webster Cent. Sch. Dist., No. 06-CV-6437, 2009 WL 232789 at *6 (W.D.N.Y. Jan. 29, 2009) (A "plaintiff must complain of discrimination in sufficiently specific terms so that the employer is put on notice that the plaintiff believes he or she is being discriminated against on the basis of race, gender, national origin, or any other characteristic protected" by law.)[20]  Thus, if the discriminatory nature of the complaint is not readily apparent, "[t]he onus is on the speaker to clarify to the employer that [she] is complaining of unfair treatment due to [her] membership in a protected class and that [she] is not complaining merely of unfair treatment generally." Aspilaire v. Wyeth Pharm., Inc., 612 F. Supp. 2d 289, 309 (S.D.N.Y. 2009) ("While plaintiff may have believed that she was the victim of discrimination, an undisclosed belief of such treatment will not convert an ordinary employment complaint into a protected activity."); see, e.g., Krasner v. HSH Nordbank AG, 680 F. Supp. 2d at 521-22 (While a plaintiff "need not have explicitly used the words 'discrimination' or 'gender' to afford [her] complaints protected activity status," if the protested activity "does not lend itself to a

---

[20]  Accord, e.g., Wimes v. Health, 157 F. App'x 327, 328 (2d Cir. 2005); Joseph v. Marco Polo Network, Inc., 09 Civ. 1597, 2010 WL 4513298 at *17 (S.D.N.Y. Nov. 10, 2010); Rommage v. MTA Long Island R.R., No. 08-cv-836, 2010 WL 4038754 at *14 (E.D.N.Y. Sept. 30, 2010); Krasner v. HSH Nordbank AG, 680 F. Supp. 2d 502, 520-22 (S.D.N.Y. 2010) (Lynch, C.J.).

reasonable inference of unlawful discrimination, such 'magic words' may be the only way to put the employer on notice that the employee believes [her]self to be complaining of discriminatory conduct." (citation omitted)); see also, e.g. Sharpe v. MCI Commc'ns Servs., Inc., 684 F. Supp. 2d 394, 406 (S.D.N.Y. 2010) (Chin, D.J.).

Here, Mayers alleges that by "agree[ing] with the statements contained in the [anonymous] letter," she made "a formal complaint to Emigrant's Vice President of Security about disparate mistreatment and harassment." (Dkt. No. 1: Compl. ¶¶ 32-33, 45.) Even assuming that Mayers possessed a good-faith belief that the "letter itself . . . was making a complaint of race, age [or] gender[] discrimination" (Dkt. No. 40: Mayers Dep. at 109-10; see page 8 above), her retaliation claim fails because she never said as much to anyone at Emigrant (see pages 8-9 above) and the letter is not susceptible to such an interpretation.

The essence of the letter is that Palombo was an incompetent and nasty manager who treated employees badly. (See pages 5-6 above.) The letter did not state or imply that Palombo mistreated call center employees because of their race, gender, age or other protected characteristic. (See page 6 above.) The letter did not refer to or in any way declare the race or age of any employee. Mayers conceded at her deposition that she did not think that by "agreeing with th[e] letter [she was] making a complaint about age, race, sex, gender or any other related discrimination against" her. (See page 8 above.) She did, however, believe the letter complained of gender discrimination "[b]ecause the majority of the names that were mentioned" in the letter were female. (See pages 8-9 above.) While Mayers is correct that most of the incidents referenced in the letter concern Palombo's callous treatment of female employees, at least two of Palombo's sixteen

"victim[s]," or approximately 12.5%, were male.  (See page 6 above; Dkt. No. 32: Romano Aff. Ex.

A: Anonymous Ltr. at 6.)  Given that under ten percent of the Ossining telephone representatives

were male (see page 2 n.1 above), the percentage of incidents involving female employees is more

than proportionate to their percentage in the Ossining call center.  Thus, while Mayers' agreement

with the complaints in the anonymous letter clearly conveyed her belief that Palombo was an

incompetent and nasty supervisor, the letter did not put Emigrant on notice that Mayers was

complaining of discrimination based on gender (or any other protected class).  See, e.g., McDowell

v. T-Mobile USA, Inc., 307 F. App'x 531, 534 (2d Cir. 2009) (Where plaintiff "never explicitly

complained about racial discrimination . . . plaintiff's supervisors could [not] have understood that

plaintiff's complaints about a paperwork delay and a co-worker's career were about race."); 

Galdieri-Ambrosini v. Nat'l Realty & Dev. Corp., 136 F.3d at 292 (No retaliation claim where

plaintiffs complaint "in no way intimated that she believed [her supervisor's] conduct to be

influenced by her gender," and therefore did not "suggest[] any complaint of gender

discrimination."); Rommage v. MTA Long Island R.R., 2010 WL 4038754 at *14 ("The mere fact

that the person or people 'making the complaints [were] African American will not convert an

ordinary complaint into a complaint of racial discrimination sufficient to put the employer on notice

of such discrimination.' . . . Because the statements displayed no obvious reference to race or gender

and plaintiff's letter addressed harassment generally, but did not mention gender or race

discrimination or harassment, there is no reason to impute to defendant any consciousness of an

unstated race or gender premise underlying the harassing conduct described."); Lee v. Sony BMG

Music Entm't, Inc., 2010 WL 743948 at *12  (Employer "cannot be charged with knowing about an

instance of discrimination if it was never told that there was any racial aspect to the situation," i.e., that her supervisor attacked her.); Inganamorte v. Cablevision Sys. Corp., No. 03-CV-5973, 2006 WL 2711604 at *16 (E.D.N.Y. Sept. 21, 2006) (Employer could not have been aware plaintiff's complaint concerned gender discrimination because the complaint failed to "state or imply that gender ha[d] anything to do with her objections" and her complaint indicated that men also received similar unfair treatment.); Bengard v. United Parcel Serv., No. 99-CV-8454, 2001 WL 1328551 at *9 (E.D.N.Y. Aug. 22, 2001) (Letter that mentioned being "humiliated, harassed, threatened and manipulated by someone with authority" but failed to reference any religious basis for the harassment is insufficient to impute to defendant employer a "consciousness of an unstated religious premise underlying the harassing conduct described in the letter."), aff'd, 48 F. App'x 350 (2d Cir. 2002).[21]

---

[21]     See also, e.g., James v. Newsweek, Inc., No. 99-9280, 213 F.3d 626 (table), 2000 WL 536409 at *1 (2d Cir. May 2, 2000) (Plaintiff's "veiled and ambiguous remark" to her supervisor that she "did not believe 'her evaluation was fair' and that she was 'going to seek justice'" was "insufficient to support the inference that she was complaining about alleged discrimination."), cert. denied, 531 U.S. 926, 121 S. Ct. 303 (2000); Braid v. MJ Peterson Corp., No. 99-7890, 208 F.3d 202 (table), 2000 WL 268568 at *1 (2d Cir. Mar. 10, 2000) (No prima facie case of retaliation where plaintiff's only evidence "that he had complained to [his employer] about race discrimination prior to his termination" was a letter that made "absolutely no mention, directly or indirectly, of race discrimination or racial issues."); Krasner v. HSH Nordbank AG, 680 F. Supp. 2d at 521 (Even assuming that plaintiff "genuinely possessed a reasonable belief that he was complaining of unlawful gender discrimination, the retaliation claim flounders on the fact that [his employer] had no way to understand his complaints as such."); Aspilaire v. Wyeth Pharm., Inc., 612 F. Supp. 2d at 310 ("[T]he mere fact that the [people] making the complaints [were] African American will not convert an ordinary complaint into a complaint of racial discrimination sufficient to put the employer on notice of such discrimination.").

Because a reasonable employer would not have understood that Mayers was making a complaint of unlawful discrimination when she told Fahey that she agreed with the contents of the anonymous letter, Mayers has not established a prima facie case of retaliation.  Emigrant's motion for summary judgment dismissing Mayers' NYSHRL and NYCHRL[22/] retaliation claims is GRANTED.

## III.    EMIGRANT'S DENIAL OF MAYERS' SEVERANCE BENEFITS PAY WAS ARBITRARY AND CAPRICIOUS

### A.    Standard of Review in ERISA Cases

ERISA section 502(a) permits the beneficiary of an employment benefit plan to bring a civil action "to recover benefits due to him under the terms of his plan."  29 U.S.C. § 1132 (a)(1)(B).  "To prevail under § 502, a plaintiff must show that (1) the plan is covered by ERISA, (2) plaintiff is a participant or beneficiary of the plan, and (3) plaintiff was wrongfully denied severance pay owed under the plan."  Giordano v. Thomson, 564 F.3d 163, 168 (2d Cir. 2009) (citations omitted); accord, e.g., Dickerson v. United Way of N.Y.C., 351 F. App'x 506, 507 (2d Cir. 2009), cert. denied, 131 S. Ct. 105 (2010); Nyame v. Bronx Lebanon Hosp. Ctr., 08 Civ. 9656, 2010 WL 1379794 at *6 (S.D.N.Y. Mar. 31, 2010).

---

[22/]    The Local Civil Rights Restoration Act of 2005, N.Y.C. Local Law No. 85 (2005), requires that a NYCHRL claim be evaluated under a more liberal approach and separately from its state and federal counterparts. E.g., Melie v. ECVI/TCI College Admin., 374 F. App'x 150, 153-54 (2d Cir. 2010); Abbunio v. City of N.Y., --- N.E. 2d ---, 2011 WL 1157706 (N.Y. Mar. 31, 2011).  Nevertheless, retaliation claims under the NYCHRL, like the NYSHRL require the employer's awareness of the protected activity.  (See pages 16-17 above.) Mayers' retaliation claim fails even under the more liberal standards under the NYCHRL, because the mismanagement claims in the anonymous letter would not have been understood by a reasonable employer as stating a gender discrimination claim.

"[A] denial of benefits challenged under [section 502(a)] is to be reviewed under a de novo standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 115, 109 S. Ct. 948, 956-57 (1989).[23/] If the plan administrator has such discretion, the benefits determination is reviewed under the arbitrary and capricious standard. E.g., Giordano v. Thomson, 564 F.3d at 168 ("Where an ERISA plan gives an administrator discretionary authority to 'determine eligibility for benefits or to construe the terms of the plan' we review the administrator's decisions under the arbitrary and capricious standard.").[24/]

Under the arbitrary and capricious standard, the "scope of review is narrow," and the Court "may overturn a decision to deny benefits only if it was 'without reason, unsupported by substantial evidence or erroneous as a matter of law.'" Pagan v. NYNEX Pension Plan, 52 F.3d 438, 442 (2d Cir. 1995); accord, e.g., Durakovic v. Bldg. Serv. 32 BJ Pension Fund, 609 F.3d at 141; Pepe v. Newspaper & Mail Deliveries'-Publishers' Pension Fund, 559 F.3d at 146-47; McCauley v. First Unum Life Ins. Co., 551 F.3d at 132; Krauss v. Oxford Health Plans, Inc., 517 F.3d at 623; Suarato v. Bldg. Serv. 32 BJ Pension Fund, 554 F. Supp. 2d 399, 416 (S.D.N.Y. 2008) (Peck, M.J.) (citing cases).  "'Substantial evidence is such evidence that a reasonable mind might accept as adequate to support the conclusion reached by the administrator and requires more than a scintilla

---

[23/]    Accord, e.g., Hobson v. Metro. Life Ins. Co., 574 F.3d 75, 82 (2d Cir. 2009); Giordano v. Thomson, 564 F.3d at 168; McCauley v. First Unum Life Ins. Co., 551 F.3d 126, 130 (2d Cir. 2008); Krauss v. Oxford Health Plans, Inc., 517 F.3d 614, 622 (2d Cir. 2008).

[24/]    Accord, e.g., Durakovic v. Bldg. Serv. 32 BJ Pension Fund, 609 F.3d 133, 138 n.2 (2d Cir. 2010); Hobson v. Metro. Life Ins. Co., 574 F.3d at 82; Pepe v. Newspaper & Mail Deliveries'-Publishers' Pension Fund, 559 F.3d 140, 146 (2d Cir. 2009); McCauley v. First Unum Life Ins. Co., 551 F.3d at 130; Krauss v. Oxford Health Plans, Inc., 517 F.3d at 622.

but less than a preponderance.'"  Durakovic v. Bldg. Serv. 32 BJ Pension Fund, 609 F.3d at 141

(quoting Celardo v. GNY Auto. Dealers Health & Welfare Trust, 318 F.3d 142, 146 (2d Cir. 2003));

accord, e.g., Miller v. United Welfare Fund, 72 F.3d 1066, 1072 (2d Cir. 1995).

> In cases where the plan administrator both evaluates and pays benefits claims, a

conflict of interest exists:

> > In such a circumstance, "every dollar provided in benefits is a dollar spent by . . . the
> > employer; and every dollar saved . . . is a dollar in [the employer's] pocket."  The
> > employer's fiduciary interest may counsel in favor of granting a borderline claim
> > while its immediate financial interest counsels to the contrary.  Thus, the employer
> > has an "interest . . . conflicting with that of the beneficiaries," the type of conflict that
> > judges must take into account when they review the discretionary acts of a trustee of
> > a common-law trust.

Metro. Life Ins. Co. v. Glenn, 554 U.S. 105, 112, 128 S. Ct. 2343, 2348 (2008) (citations omitted);

accord, e.g., Durakovic v. Bldg. Serv. 32 BJ Pension Fund, 609 F.3d at 138 ("Employer-

administrators have a categorical conflict.");  McCauley v. First Unum Life Ins. Co., 551 F.3d at 133.

> Such a conflict "must be weighed as a 'facto[r] in determining whether there is an

abuse of discretion,'" but does not change the standard of review from deferential to de novo.

Firesone Tire & Rubber Co. v. Bruch, 489 U.S. at 115, 109 S. Ct. at 957; see, e.g., Metro. Life Ins.

Co. v. Glenn, 554 U.S. at 111, 115, 128 S. Ct. at 2348, 2350 ("Trust law continues to apply a

deferential standard of review to the discretionary decision making of a conflicted trustee, while at

the same time requiring the reviewing judge to take account of the conflict when determining

whether the trustee, substantively or procedurally, has abused his discretion.");  McCauley v. First

Unum Life Ins. Co., 551 F.3d at 128, 133 ("[A] plan under which an administrator both evaluates

and pays benefits claims creates the kind of conflict of interest that courts must take into account

and weigh as a factor in determining whether there was an abuse of discretion, but does not make de novo review appropriate.  This is true even where the plaintiff shows that the conflict of interest affected the choice of a reasonable interpretation.") (citations omitted).[25/]

The weight a Court assigns to a conflict of interest "depends on the circumstances" and "varies in direct proportion to the 'likelihood that [the conflict] affected the benefits decision.'" Durakovic v. Bldg. Serv. 32 BJ Pension Fund, 609 F.3d at 138-39; see, e.g., Metro. Life Ins. Co. v. Glenn, 554 U.S. at 117, 128 S. Ct. at 2351 ("The conflict of interest . . . should prove more important (perhaps of great importance) where circumstances suggest a higher likelihood that it affected the benefits decision, including, but not limited to, cases where an insurance company administrator has a history of biased claims administration.  It should prove less important (perhaps to the vanishing point) where the administrator has taken active steps to reduce potential bias and to promote accuracy, for example, by walling off claims administrators from those interested in firm finances, or by imposing management checks that penalize inaccurate decision making irrespective of whom the inaccuracy benefits." (citations omitted)); McCauley v. First Unum Life Ins. Co., 551 F.3d at 133 (same).  Such a conflict may "act as a tiebreaker when the other factors are closely balanced." Metro. Life Ins. Co. v. Glenn, 554 U.S. at 117, 128 S. Ct. at 2351; accord, e.g., Mohamed v. Sanofi-Aventis Pharm., 2009 WL 4975260 at *15.

ERISA Section 503(2) "requires that claims for benefits be afforded a 'full and fair review by the appropriate named fiduciary of the decision denying the claim.'"  Hobson v. Metro.

---

[25/]     Accord, e.g., Durakovic v. Bldg. Serv. 32 BJ Pension Fund, 609 F.3d at 138; Hobson v. Metro. Life Ins. Co., 574 F.3d at 82-83.

Life Ins. Co., 574 F.3d 75, 86 (2d Cir. 2009) (quoting 29 U.S.C. § 1133(2)).  A "[f]ull and fair review" requires, inter alia, that the Plan Administrator "take[] into account all comments, documents, records, and other information submitted by the claimant relating to the claim, without regard to whether such information was submitted or considered in the initial benefit determination." 29 C.F.R. § 2560.503-1(h)(2)(iv).  A Plan Administrator has discretion to "weigh competing evidence, but it may not . . . cherry-pick the evidence it prefers while ignoring significant evidence to the contrary."  Winkler v. Metro. Life Ins. Co., 170 F. App'x. 167, 168 (2d Cir. 2006); accord, e.g.,  Mohamed v. Sanofi-Aventis Pharm., 06 Civ. 1504, 2009 WL 4975260 at *14 (S.D.N.Y. Dec. 22, 2009); Clark v. First Unum Life Ins. Co., 04 Civ. 9050, 2009 WL 1150318 at *2 (S.D.N.Y Apr. 29, 2009).  A "decision that falls short of a full and fair review will not be affirmed even under the deferential [arbitrary and capricious] standard."  Suarato v. Bldg. Servs. 32BJ Pension Fund, 554 F. Supp. 2d at 419 (quotations omitted; citing cases).

### B.   Emigrant's Denial of Mayers' Severance Benefits Claim Was Arbitrary And Capricious, And Not The Result of a Full And Fair Review

Mayers alleges that she was wrongly denied severance benefits because "the determination of [] Emigrant . . . to fire [her] for cause was pretextual, and [she] was thus not disqualified from receiving the benefits under the Plan."  (Dkt. No. 1: Compl. ¶ 77; see Compl. ¶¶ 56-60.)  Mayers also alleges that Emigrant did not conduct a "full and fair review" of her severance pay claim.  (Compl. ¶¶ 62-66, 84-87.)

It is undisputed that Emigrant's benefit plan is covered by ERISA and that Mayers was a beneficiary of the plan.  (See Dkt. No. 1: Compl. ¶¶ 9-11, 48, 69, 75; Dkt. No. 30: Emigrant Br. at 16-18; Dkt. No. 34: Nipe Aff. Ex. 2: Summary Plan Description at 16-17.)  Thus, the only

issue before the Court is whether Mayers was "wrongfully denied severance pay owed under the plan." (See cases cited on page 25 above.)  Because Emigrant's benefits plan grants discretion to the plan administrator to determine eligibility for severance benefits (see page 9 n.7 above; Nipe Aff. Ex. 1: Year 2000 Severance Pay & Outplacement Program §§ 9-12), Emigrant's determination that Mayers is not entitled to severance benefits is examined under the arbitrary and capricious standard of review, and must be upheld if it is supported by "substantial evidence." (See cases cited on page 26 above.)

Following Mayers' initial claim submission, Nipe reviewed Romano's December 1, 2008 memorandum and "spoke with" certain unnamed individuals (presumably Romano and Fahey) "responsible for the investigation of the anonymous letter." (Nipe Aff. ¶ 5; see page 9 above.) Based entirely on Romano's allegation that Mayers had discussed "confidential information" with "her subordinates," the Fiduciary Committee determined that Mayers properly was fired "for cause." (Nipe Aff. Ex. 6: Nipe 1/27/09 Ltr.; see pages 9-10 above.)  Thereafter, Mayers submitted to Nipe an appeal letter and affidavit asserting that she did not violate Romano's directives. (Nipe Aff. Ex. 7: Dagg 2/2/09 Ltr. & Mayer Aff.; see page 10 above.)  In particular, Mayers swore that she consistently refrained from discussing the investigation with others and told her subordinates to do the same. (Nipe Aff. Ex. 7: Mayer Aff. ¶¶ 13, 15, 24; see pages 4, 10 above.)  More importantly, Mayers stated that she immediately informed Romano that Kelly had been contacted by former Emigrant employees. (Mayer Aff. ¶¶ 16, 24; see page 4 above.)  On May 19, 2009, "after reviewing [Mayers'] appeal and the affidavit submitted in connection with the appeal," Nipe issued a letter denying Mayers' appeal. (Nipe Aff. ¶ 10 & Ex. 8: Nipe 5/19/09 Ltr.; see page 11 above.)

Although the Fiduciary Committee's determination that Mayers was terminated "for cause" (and therefore ineligible for severance benefits) is supported by some evidence, i.e., Romano's December 1, 2008 memorandum, its decision was based on a superficial investigation of the facts and did not take into account evidence that Mayers had complied with Romano's directives. Importantly, Romano's December 1, 2008 memorandum does not explain how Mayers' alleged infractions were "brought to Kim's [Romano's] attention," or what about the investigation Mayers allegedly discussed with her subordinates.[26]  (Nipe Aff. Ex. 6: Romano Memo.; see pages 9-10 above.) Absent such information, the Fiduciary Committee's determination that Mayers disregarded Romano's directives is arbitrary and capricious.  It is possible, for example, as Mayers alleges, that she merely told Kelly not to discuss the investigation and to report any such discussions to Romano.

Moreover, despite Mayers' conflicting account, the Fiduciary Committee accepted Romano's threadbare allegations without further investigation.  In light of the protestations of innocence by Mayers -- a 20 plus year Emigrant employee -- a reasonable fiduciary would have conducted a more thorough investigation, including, for instance, asking Romano what Mayers allegedly told Kelly, how Romano learned of that discussion and whether Mayers informed Romano that Kelly had been contacted by former Emigrant employees.  See Mohamed v. Sanofi-Aventis Pharm., 06 Civ. 1504, 2009 WL 4975260 at *14, 17 (S.D.N.Y. Dec. 22, 2009) (Denying summary judgment because, inter alia, Committee did not investigate plaintiff's claim that he did not violate

---

[26]   Romano's affidavit in support of Emigrant's summary judgment motion alleges that Romano personally "observed" Mayers discussing the investigation with Kelly, which is contrary to what is in Romano's memo that Nipe relied upon; in any event Romano's affidavit fails to specify what about the investigation Mayers and Kelly allegedly discussed.  (See Dkt. No. 32: Romano Aff. ¶ 7.)

company policy); <u>Page</u> v. <u>Bancroft Neurohealth, Inc.</u>, 575 F.Supp. 2d 664, 680 (E.D. Pa. 2008) (Denying defendant's summary judgment motion because "[t]he record evidence presented by [the Plan Administrator] in support of its decision fails to satisfy the factual questions raised by Plaintiff."); <u>Anderson</u> v. <u>Sotheby's, Inc.</u>, 04 Civ. 8180, 2006 WL 1722576 at *15-16 (S.D.N.Y. June 22, 2006) (Benefits determination was arbitrary and capricious where "the Committee relied heavily on certain excerpts from . . . self-serving interviews . . . to the exclusion of contrary evidence" and "also ignored portions of the interviews that did not support its decision."); <u>Poehlmann</u> v. <u>Duetsche Bank Ams. Severance Pay Plan</u>, No. Civ. A. 04-2669, 2005 WL 1875529 at *9 (E.D. Pa. Aug. 8, 2005) (Because "the Committee was faced with conflicting accounts . . . , yet relied exclusively on the Denaro Memo and conducted no independent review whatsoever," its conclusion was "the epitome of an arbitrary and capricious decision.").

The fact that Emigrant both evaluates and pays employee benefits claims also weighs against granting summary judgment to Emigrant.  (<u>See</u> cases cited at pages 27-28 above.)  The conflict of interest inherent in such situations is amplified here because Nipe, who participated in the decision to terminate Mayers' employment and was present at the meeting where Mayers was fired (<u>see</u> page 8 above), also was responsible for investigating and deciding Mayers' severance benefits claim (<u>see</u> Nipe Aff. ¶¶ 4-10).  Such circumstance certainly undermined Nipe's ability to act impartially, and appears very likely to have influenced Emigrant's severance benefits determination.

Finally, although Nipe's May 19, 2009 letter denying severance pay states that Mayers' appeal had been "reviewed by the Fiduciary Committee" (Nipe Aff. Ex. 8: Nipe 5/19/09

Ltr.), Nipe's affidavit merely states that after "reviewing [Mayers'] appeal and the affidavit submitted in connection" therewith, Nipe issued a letter denying Mayers appeal (Nipe Aff. ¶ 10).  Accordingly, there is ambiguity whether anyone on the Fiduciary Committee, other than Nipe, considered Mayers' affidavit, and thus whether Mayers' right to a "full and fair review" was violated.  <u>See</u> cases and regulations cited at pages 28-29 above, <u>see also</u>, <u>e.g.</u>, <u>Mohamed</u> v. <u>Sanofi-Aventis Pharm.</u>, 2009 WL 4975260 at *14, 16 (Committee's failure to review plaintiff's appeal letter, and other evidence that plaintiff was not fired for cause, "violated Plaintiff's right to a 'full and fair review' of his benefits claim as a matter of law."); <u>Eymer</u> v. <u>Ground Round, Inc.</u>, 913 F. Supp. 693, 698 (N.D.N.Y. 1996) ("The ambiguity regarding whether the Benefits Committee ever genuinely considered plaintiffs' arguments, along with the fact that the Administrator may have acted under a conflict of interest compels the Court to conclude that questions of material fact exist as to whether the Administrator's decision denying benefits was arbitrary and capricious as a matter of law. Therefore, defendants' [summary judgment] motion is denied as to these claims.").

Because Emigrant did not adequately investigate the events precipitating Mayers termination, the Fiduciary Committee did not have sufficient information to make an informed decision that Mayers was fired "for cause."  It also is unclear whether Nipe summarily denied Mayers' appeal without circulating to the Fiduciary Committee evidence that Mayers complied with Romano's directives.  Given Emigrant's dual role as payor and evaluator of Mayers' severance pay claim, and Nipe's more palpable conflict due to her active role in Mayers' termination, the denial of Mayers' claim on such insubstantial evidence is questionable.  Accordingly, the Court finds that

Emigrant's denial of Mayers' severance pay claim was arbitrary and capricious and Emigrant's summary judgment motion on this claim therefore is <u>DENIED</u>.

> **C.    <u>The Appropriate Relief is a Remand to the Emigrant Fiduciary Committee</u>**

Although Emigrant's denial of Mayers' claim was arbitrary and capricious, and done without a full and fair review, the administrative record is insufficient to determine whether Mayers was terminated "for cause."  Only after a more thorough investigation of the allegations raised in Mayers' affidavit will such a determination be possible.  The appropriate remedy, however, is not to schedule a trial date but rather is to remand the case to Emigrant's Fiduciary Committee "with instructions to consider additional evidence."[27/] <u>Miller</u> v. <u>United Welfare Fund</u>, 72 F.3d 1066, 1071 (2d Cir. 1995) ("Because district courts are required to limit their review to the administrative record, it follows that, if upon review a district court concludes that the [plan administrator's] decision was arbitrary and capricious, it must remand to the [plan administrator] with instructions to consider additional evidence unless no new evidence could produce a reasonable conclusion permitting denial of the claim or remand would otherwise be a 'useless formality.'"); <u>see</u>, <u>e.g.</u>, <u>Pepe</u> v. <u>Newspaper & Mail Deliveries'-Publishers' Pension Fund</u>, 559 F.3d 140, 149 (2d Cir. 2009) (Remand of arbitrary and capricious denial of benefits claim warranted where "additional evidence might produce a reasonable conclusion permitting denial of [plaintiff's] claim."); <u>Krauss</u> v. <u>Oxford</u>

---

[27/]    On remand, Emigrant also should take appropriate steps to reduce potential bias.  In particular, Emigrant should select claims administrators who, unlike Nipe, had no direct involvement in Mayers' discharge and who can impartially evaluate Mayers' claim.  The Court also notes that Mayers worked for Emigrant for more than twenty years, and the denial of her severance benefits on these facts, even if it turns out to be appropriate, seems quite unfair.  The Court suggests the parties try to settle this matter, and the Court is available to assist in such efforts if the parties desire such assistance.

Health Plans, Inc., 517 F.3d 614, 630 (2d Cir. 2008) ("A full and fair review concerns a beneficiary's procedural rights, for which the typical remedy is remand for further administrative review."); Magee v. Metro. Life Ins. Co., 07 Civ. 8816, 2009 WL 3682423 at *1 (S.D.N.Y. Oct. 15, 2009) ("MetLife failed to consider much of the evidence.  Moreover, [plaintiff] did not 'clearly' show that he was entitled to benefits.  Accordingly, remand is the appropriate remedy.").[28]

Accordingly, Emigrant's denial of Mayers' severance pay claim is vacated and the matter is remanded to the Plan Administrator for further consideration in a manner consistent with this opinion.

**IV.   MAYERS' ERISA DISCRIMINATION CLAIM IS MERITLESS**

ERISA Section 510 makes it "unlawful for any person to discharge, fine, suspend, expel, discipline, or discriminate against a participant or beneficiary [of an employee benefit plan] . . . for the purpose of interfering with the attainment of any right to which such participant may become entitled under the plan."  29 U.S.C.A. § 1140.[29]  "This prohibition includes characterizing an employee's termination as one 'for cause' for the purpose of unlawfully denying that employee severance benefits."  Madera v. Marsh USA, Inc., 426 F.3d 56, 61 (1st Cir. 2005).[30]

---

[28]   See also, e.g., Winkler v. Metro. Life Ins. Co., 170 F. App'x at 169; Levitian v. Sun Life & Health Ins. Co., 09 Civ. 2965, 2011 WL 565330 at *3 (S.D.N.Y. Feb. 9, 2011); Mohamed v. Sanofi-Avenits Pharm., 2009 WL 4975260 at *17; Cohen v. Metro. Life Ins. Co., 485 F. Supp. 2d 339, 353 (S.D.N.Y. 2007), aff'd, 334 F. App'x 375 (2d Cir. 2009).

[29]   "Section 510 was designed primarily to prevent 'unscrupulous employers from discharging or harassing their employees in order to keep them from obtaining vested pension rights.'" Dister v. Cont'l Group, Inc., 859 F.2d 1108, 1111 (2d Cir. 1988).

[30]   Because the denial of severance pay necessarily presupposes an employee's discharge, such claims properly are analyzed under section 510's discrimination clause.  See Forchini v.
                                                                                            (continued...)

"An essential element of plaintiff's proof under the statute [i.e., § 510] is to show that an employer was at least in part motivated by the specific intent to engage in activity prohibited by § 510." Dister v. Cont'l Grp., Inc., 859 F.2d at 1111 (There is no "'cause of action [under § 510] where the loss of pension benefits was a mere consequence of, but not a motivating factor behind,'" the adverse employment action.); see, e.g., Berube v. Great Atl. & Pac. Tea Co., 348 F. App'x 684, 687 (2d Cir. 2009) ("To succeed on a Section 510 claim, a plaintiff must demonstrate the employer specifically intended to interfere with benefits."); Lightfoot v. Union Carbide Corp., 110 F.3d 898, 906 (2d Cir. 1997) ("To defeat summary judgment [plaintiff] had to adduce some evidence from which a reasonable jury could conclude that [defendant] terminated his employment with the intent to reduce his pension benefits."), cert. denied, 528 U.S. 817, 120 S. Ct. 56 (1999). "Because the existence of a specific intent to interfere with an employee's benefit rights is critical in § 510 cases - yet is seldom the subject of direct proof," district courts apply the familiar McDonnell Douglas burden shifting framework to § 510 discrimination claims. Dister v. Cont'l Grp., Inc., 859 F.2d at 1111-12 ("Employers of a mind to act contrary to law seldom note such a motive in their employee's

---

30/      (...continued)
Equibank, NA, 660 F. Supp. 1436, 1438-39 (W.D. Pa. 1987) (Plaintiff's claim that defendant characterized his discharge as one for cause "for the purpose of interfering with his receipt of severance pay" properly "sounds under the 'discrimination' prohibition of section 510."). To establish a prima facie case of unlawful discrimination under section 510, a plaintiff must show that she: (1) belongs to a protected group; (2) was qualified for the position; and (3) suffered an adverse employment action under circumstances that give rise to an inference of discrimination. See, e.g., Dister v. Cont'l Grp., Inc., 859 F.2d at 1114-15 (applying elements of Title VII unlawful termination claim to ERISA discharge claim.) In ERISA § 510 cases, beneficiaries of a covered plan constitute a "protected group." E.g., Dister v. Cont'l Grp., Inc., 859 F.2d at 1115 ("Because § 510 of ERISA protects those employees who have an opportunity to attain rights in a covered benefit plan, . . . plaintiff is in a protected group.").

personnel dossier. . . .  The McDonnell Douglas procedure attempts to compensate for this lack of

evidence to ensure that the employee has his or her day in court."); accord, e.g., Resner v. Arc Mills,

Inc., No. 97-7981, 152 F.3d 920 (table), 1998 WL 385771 at *1 (2d Cir.) ("[C]laims brought under

§ 510 are analyzed using the burden-shifting framework set forth in McDonnell Douglas."), cert.

denied, 525 U.S. 947, 119 S. Ct. 371 (1998); Mohamed v. Sanofi-Aventis Pharm., 06 Civ. 1504,

2009 WL 4975260 at *17 (S.D.N.Y. Dec. 22, 2009); Quinby v. WestLB AG,  04 Civ. 7406,  2007

WL 1153994 at *15 (S.D.N.Y. Apr. 19, 2007).

        Mayers alleges that Emigrant's stated grounds for her "for cause" termination were

pretextual and done to avoid paying her severance benefits.  (Dkt. No. 1: Compl. ¶¶ 70-72.)

Emigrant asserts that Mayers was fired because she "fail[ed] to comply with an express mandate

from Kimberly Romano not to discuss or disclose any matters involving Emigrant's investigation

of the anonymous letter."  (See page 10 above.)  Mayers concedes that if employees "engaged in a

discussion with co-workers about the investigation in violation of Ms. Romano's order not to do

that," Emigrant could legitimately terminate their employment "for cause."  (Dkt. No. 40: Mayers

Dep. at 192-93.)  Mayers has the burden to demonstrate that Emigrant's "'proffered explanation is

unworthy of credence'" and that intent to interfere with her severance benefits was a substantial

reason behind Emigrant's characterizing her discharge as one "for cause." E.g., Dister v. Cont'l Grp.,

Inc., 859 F.2d at 1112 (At the third step of the McDonnell Douglas framework, "[t]he plaintiff's

ultimate burden of persuading the trier of fact that he or she was the victim of intentional

discrimination then merges with the plaintiff's burden of proving that the employer's reason is

pretextual.  This may be accomplished 'either directly by persuading the court that a discriminatory

reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence.'" (citations omitted)); see also cases cited at pages 16-20 above, discussing the McDonnell Douglas burden shifting framework.

   Mayers contends that Emigrant's intent to interfere with her attainment of benefits is demonstrated by the fact that Emigrant initially told Mayers that she was being fired because she "failed to live up to her managerial responsibilities" and because she "withheld evidence," but was told after she applied for severance pay that she was fired because she discussed the confidential investigation with co-workers and did not report those conversations to her supervisors.  (See Dkt. No. 1: Compl. ¶¶ 46-56; see page 8 above.)  The implication of discrimination evoked by this minor discrepancy, if any, is too tenuous to create a genuine issue of material fact.  See, e.g., Dister v. Cont'l Grp., Inc., 859 F.2d at 1116 (Minor "inconsistencies in testimony of [defendant] executives concerning the specific circumstances of [plaintiff's] discharge" were insufficient to "cause a reasonable jury to doubt [defendant's] explanation for [plaintiff's] discharge from employment."); Sarmiento v. Queens Coll. CUNY, 386 F. Supp. 2d 93, 105 (E.D.N.Y.) (Inconsistencies in defendant's statements regarding knowledge of plaintiff's ethnicity were "insufficient to raise a material issue of fact regarding pretext, because the evidence is minor and inconclusive as compared to the overwhelming evidence that Defendant chose not to hire Plaintiff for exactly the reason they stated."), aff'd, 153 F. App'x 21 (2d Cir. 2005).  More importantly, the explanation given at Mayers' October 22, 2008 termination meeting does not actually contradict the explanation stated in Romano's December 1, 2008 memorandum:  Emigrant's statement that Mayers "failed to live up to her managerial responsibilities" is sufficiently broad to encompass Romano's allegation that Mayers

discussed the investigation with co-workers despite being told not to, and the statement that Mayers "withheld evidence" is consistent with, rather than contradictory to, Romano's claim that Mayers' "failed to make [Romano] or [Fahey] aware that employees under her supervision were discussing confidential information." (See pages 9-10 above.)

Because Mayers has adduced no evidence that deprivation of her severance pay was a motivating factor behind, rather than merely a consequence of, Emigrant's decision to fire her "for cause," Emigrant's summary judgment motion on Mayers' ERISA § 510 discrimination claim is GRANTED.

## CONCLUSION

For the reasons set forth above, Emigrant's summary judgment motion (Dkt. No. 29) is GRANTED as to Mayers' NYSHRL and NYCHRL retaliation claims and ERISA § 510 discrimination claim, and is DENIED as to Mayers' ERISA § 502 wrongful denial of benefits claim. Emigrant's denial of Mayers' severance pay claim is VACATED and this matter is REMANDED to the plan administrator for further proceedings. The Clerk of Court is directed to close this case.

SO ORDERED.

Dated:      New York, New York
            April 22, 2011


                                        _____
                                        Andrew J. Peck
                                        United States Magistrate Judge


Copies to:   Cheryl Mayers (Regular & Certified Mail)
             Evandro C. Gigante, Esq.
             Bettina B. Plevan, Esq.


H:\OPIN\MAYERS-Cheryl